**STATE v. DERBYSHIRE**

[228 N.C. App. 670 (2013)]

STATE OF NORTH CAROLINA
v.
ADAM DERBYSHIRE

No. COA12-1382

Filed 6 August 2013

**Search and Seizure—vehicular stop—reasonable suspicion—weaving within lane**

The trial court erred in a driving while impaired case by denying defendant's motion to suppress evidence seized during the stop of defendant's vehicle. The police officer did not have the reasonable and articulable suspicion necessary to justify the stop of defendant's vehicle based solely on the fact that defendant weaved only once, causing the right side of his tires to cross the dividing line in his direction of travel.

Appeal by Defendant from order entered 2 June 2011 by Judge Howard E. Manning, Jr., and judgment entered 1 June 2012 by Judge William R. Pittman in Wake County Superior Court. Heard in the Court of Appeals 23 April 2013.

*Attorney General Roy Cooper, by Assistant Attorney General John W. Congleton, for the State.*

*Currin & Currin, by George B. Currin, for Defendant.*

STEPHENS, Judge.

*Factual Background and Procedural History*

This case arises from the 8 November 2006 arrest of Adam Derbyshire ("Defendant") on the charge of driving while impaired. The case has appeared before this Court once before, and, in a 2010 unpublished opinion, we described its procedural history as follows:

On 8 November 2006, Defendant was arrested and charged with driving while impaired. On 30 June 2008 Defendant was convicted of that offense in Wake County District Court and entered notice of appeal to Wake County Superior Court for a trial *de novo*. On 25 February 2009, Defendant filed a [m]otion to [s]uppress [e]vidence in Wake County Superior Court, alleging that no reasonable

and articulable suspicion existed to justify the stop of his vehicle.

. . . .

Defendant's motion to suppress was denied on 19 June 2009 by the Honorable Ronald L. Stephens. On 10 July 2009, Defendant pled guilty to the offense of driving while impaired in Wake County Superior Court. Defendant reserved his right to appeal the denial of his motion to suppress. Upon his guilty plea, the Honorable Abraham P. Jones sentenced Defendant to Level 5 punishment for driving while impaired[] and imposed a suspended sentence of sixty (60) days imprisonment and twelve (12) months unsupervised probation.

*State v. Derbyshire*, 207 N.C. App. 749, 701 S.E.2d 404 (2010) (unpublished disposition), available at 2010 WL 4290202 at *1. On appeal in that case, Defendant argued that the trial court erred by failing to make written findings of fact to support its denial of his motion to suppress. *Id.* We agreed and remanded the case to the Wake County Superior Court for further proceedings consistent with our opinion. *Id.* at *3.

A new evidentiary hearing was held on 31 May 2011. Thereafter, the trial court, the Honorable Howard E. Manning, Jr., presiding, denied Defendant's motion to suppress by written order entered 2 June 2011. In that order, the court made the following findings of fact and conclusions of law:

> . . . . The [c]ourt, having heard evidence and arguments of counsel, *finds the facts* to be as follows:
>
> 1. On Wednesday, 8 November 2006, Sergeant T.D. Turner [("Sgt. Turner")] was employed by the City of Raleigh as a police officer. She had been employed by the [City] for fifteen years prior to the date of this offense.
>
> 2. At or around 10:05[] that evening, Sgt. Turner first came into contact with []Defendant[,] who was driving northbound on Glenwood Avenue[.]
>
> 3. Sgt. Turner's attention was . . . drawn to []Defendant's vehicle when she observed what she believed to be []Defendant operating his vehicle with the high beam headlights activated.

4.  Sgt. Turner testified that as is customary among motorists, she flashed her own high beam headlights roughly three times to inform []Defendant to dim his headlights.

5.  She further testified that []Defendant did not appear to acknowledge this message and that[,] in addition, she observed that []Defendant had a blank stare when she passed him.

6.  Sgt. Turner then made a three point turn and began to follow []Defendant's vehicle after which point she observed []Defendant's vehicle weave in and out of his traffic lane, with the right tires crossing the dividing lane line.

7.  Based on Sgt. Turner's observations of []Defendant and his operation of his vehicle, she then activated her blue lights to initiate a traffic stop of []Defendant's vehicle.

8.  []Defendant then testified and offered a conflicting account of the events that occurred that evening[.]

9.  Defendant stated that he had been at dinner . . . at Vin Restaurant off of Glenwood Avenue prior to the traffic stop[.] He also testified that he had a roughly two hour long dinner, []during which he . . . drank a martini and half a bottle of wine.

10. Defendant indicated that he did not have his high beam headlights activated and also did not see Sgt. Turner[] signaling for him to turn them off. . . .

Based on the foregoing *findings of fact*, the [c]ourt *concludes as a matter of law that*:

1.  []Defendant gave a materially conflicting version of the facts . . . .

2.  Sgt. Turner's version corroborates the fact that []Defendant had been coming from Vin Restaurant when the event took place. Acknowledging the conflicts of these two versions, the [c]ourt finds Sgt. Turner's testimony to be credible.

3.  The [c]ourt finds that Sgt. Turner reasonably believed []Defendant's high beam headlights to have been activated, that she signaled three times for []Defendant to turn

them down, that she then followed Defendant's vehicle at which point she observed []Defendant fail[] to maintain lane control.

Based upon the totality of the circumstances on this occasion, there was a sufficient basis upon which to form an articulable suspicion of impaired driving in the mind of a reasonable and cautious officer.

Defendant entered a plea of guilty on 1 June 2012, the Honorable William R. Pittman presiding. Defendant specifically reserved his right to appeal the trial court's denial of his motion to suppress. He gave notice of appeal in open court that same day.

### Standard of Review

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "Even if evidence is conflicting, the trial judge is in the best position to resolve the conflict." *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (quotation marks omitted). "Indeed, an appellate court accords great deference to the trial court in this respect because it is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision[.]" *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619–20. "The trial court's conclusions of law, however, are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

### Discussion

On appeal, Defendant contends that: (1) the trial court's findings of fact are not adequate to support its conclusions of law; (2) the trial court's findings of fact and third conclusion of law are not supported by competent evidence; (3) Sgt. Turner did not have a reasonable and articulable suspicion necessary to justify the stop of Defendant's vehicle; and (4) the trial court's conclusion that there was sufficient evidence "upon which to form an articulable suspicion of impaired driving in the mind of a reasonable and cautious officer" is legally inadequate to support the denial of his motion to suppress and does not reflect a correct application of legal principles. We agree with Defendant's third argument and reverse the trial court's denial of his motion to suppress on

those grounds. Because our determination on that issue is dispositive, we need not address Defendant's remaining arguments.

## I. *The Parties' Testimony*

[1] At the hearing, Sgt. Turner testified as follows to her reasons for stopping Defendant:

> Q. . . . [O]n November 8th, 2006, approximately 10:05 p.m. did you come in contact with []Defendant?
>
> A. Yes, sir, I did.
>
> . . . .
>
> Q. And where did you come in contact with []Defendant?
>
> A. Along the Glenwood south corridor. I was heading southbound on Glenwood when I encountered [] Defendant coming northbound on Glenwood Avenue [in Raleigh].
>
> . . . .
>
> Q. And what drew your attention to []Defendant?
>
> A. Initially, my attention was drawn to []Defendant because of what I thought was his high beam lights were on. They were very, very bright and as we approached each other, I flashed my high beam lights at him three times and in an attempt to get him to dim his high beams and when that didn't occur, we began to meet almost as if to pass and I looked over at him and I observed a blank stare. He was very wide eyed and that's an indication of a potential for an impaired driver.
>
> . . . .
>
> Q. . . . . And now back to your encounter with []Defendant, what happened after you made that three point turn?
>
> A. I fell in directly behind []Defendant and began to follow him northbound on Glenwood Avenue.
>
> Q. Did you make any observations of []Defendant's vehicle when you began to follow him?
>
> A. I did. As he proceeded northbound I observed him weave from left to right in his designated lane of travel.

And as we crossed over . . . Peace Street . . . , I decided to activate my emergency equipment to investigate the potential that he might be an impaired driver.

Q. And so the only — how many times did you see []Defendant weave from left to right?

A. I saw him weave left to right at least once. And as soon as we crossed over Peace Street I activated my blue lights.

Q. And was the weaving entirely within his lane of travel or did he ever —

A. I believe he went into the right-hand travel lane one time.

. . . .

Q. How far over in the right travel lane did []Defendant cross?

A. I don't believe I had that indicated in my notes, just that it was the right side of his tires crossed over.[1]

. . . .

Q. Could you basically just sum up for the Court what . . . made you decide to activate your blue lights.

A. The training that I've received over the years has taught me that there are certain indicators and having bright lights on your vehicle or no lights at all is sometimes an indicator, coupled with other behavior like the blank stare that I observed. When I turned around and followed him, he failed to maintain his travel lane. So he weaved from left to right in his travel lane without maintaining the lane. And then when I observed the right side of his vehicle cross over into the right-hand lane, I felt like I had enough . . . at that point to stop him and investigate my suspicions.

Q. Okay. And — now, the Judge just mentioned in this right travel lane that there are cars parked. Were there cars parked that night in that right lane?

---

1. The right side of Defendant's tires did not cross the line separating his lane of traffic from oncoming traffic. Rather, the tires crossed the line separating those two lanes of traffic headed in the same direction. At no point did Defendant cross the center line or the solid white line on the outer edge of the road.

A. Yes, sir, I believe there were. There's usually cars parked there all the time.

. . . .

Sgt. Turner continued on cross-examination:

A. I remember []Defendant told me that . . . kind vehicle [sic] he drove that the lights were unusually bright.

Q. Well, he was driving a 2004 Land Rover automobile[,] correct?

A. Yes, sir.

Q. And that's some sort of SUV that sits high off the ground[,] correct?

A. Yes, sir. He was explaining to me [that] it had some sort of different bulbs and that's why they appeared bright.

Lastly, Defendant took the stand in his own defense and testified to the following:

A. . . . . My lights were on the automatic mode which they are always on. So the lights go on when the windshield senses rain or if it starts to get dark out.

. . . .

Q. Were your lights on high beam at any time?

A. They were not, and actually when [Sgt.] Turner pulled me over I asked her why did you pull me over . . . she said ["]your high beams were on["] and I then flipped my high beams on to show [that] they were not on and when you engage the high beams in my car a purple light in the middle of the dash illuminates and it's very easy to understand that your high beams are on.

. . . .

A. . . . [My headlights] are halogen lights and they can . . . — it's kind of a clear brightness. It's just a different brightness from a . . . normal light.

The State presented no evidence that the stop occurred in an area of high alcohol consumption or that Sgt. Turner considered such a fact as a part of her decision to stop Defendant.

## II.  Legal Background

"Both the United States and North Carolina Constitutions protect against unreasonable searches and seizures." *State v. Otto*, 366 N.C. 134, 137–38, 726 S.E.2d 824, 827 (2012) (citations and certain quotation marks omitted). A traffic stop is considered a seizure and has been "historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1, []20 L. Ed. 2d 889 (1968). Therefore, reasonable suspicion is the necessary standard for traffic stops." *Id.* Reasonable suspicion exists when "the totality of the circumstances — the whole picture" — supports the inference that a crime has been or is about to be committed. *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 440 (2008) (citations and quotation marks omitted). This standard is "less demanding . . . than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* at 414, 665 S.E.2d at 439 (citation and quotation marks omitted). "The standard is satisfied by some minimal level of objective justification," but requires that the stop be based on "specific and articulable facts, as well as . . . rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *Id.* (citations and quotation marks omitted). It is often described as "more than [a] . . . hunch." *Id.* at 424, 665 S.E.2d at 445 (Bradley, J., dissenting) (citation and quotation marks omitted).

On a number of occasions, this Court has determined that an officer has the reasonable suspicion necessary to justify an investigatory stop after observing an individual's car weaving in the presence of certain other factors. This has been referred to by legal scholars as the "weaving plus" doctrine. *See, e.g.*, Jeff Welty, *Weaving and Reasonable Suspicion*, North Carolina Criminal Law — UNC School of Government Blog (19 June 2012), http://nccriminallaw.sog.unc.edu/?p=3677. In *State v. Watson*, 122 N.C. App. 596, 472 S.E.2d 28 (1996), we determined that reasonable suspicion sufficient to justify a stop was present at approximately 2:30 "[one morning] on a road near a nightclub" when the defendant was "driving on the center line and weaving back and forth within his lane for 15 seconds." *Id.* at 598–99, 472 S.E.2d at 29–30. Eight years later, in *State v. Jacobs*, 162 N.C. App. 251, 590 S.E.2d 437 (2004), we upheld the trial court's denial of the defendant's motion to suppress when an officer had observed the defendant's vehicle "slowly weaving within its lane of travel touching the designated lane markers on each side" for three quarters of a mile at 1:43 on a Thursday morning "in an area near bars." *Id.* at 255, 590 S.E.2d at 440–41. We noted in *Jacobs* that the facts were nearly "indistinguishable from *Watson* in that, although

[the] defendant's weaving within his lane was not a crime, that conduct combined with the unusual hour and the location was sufficient to raise a reasonable suspicion of impaired driving." *Id.* (citations omitted).

Without these "plus" factors, we have — until recently — failed to conclude that a reasonable and articulable suspicion sufficient to justify a stop exists in "weaving only" circumstances. In *State v. Fields*, 195 N.C. App. 740, 673 S.E.2d 765, *disc. review denied*, 363 N.C. 376, 679 S.E.2d 390 (2009) [hereinafter *Fields 2009*], for example, the defendant was pulled over at approximately 4:00 on a Thursday afternoon after the officer observed his car "swerve to the white line on the right side of the traffic lane" on three separate occasions. *Id.* at 741, 673 S.E.2d at 766. Noting that there must be "additional specific articulable facts" beyond mere weaving in order for there to be reasonable suspicion — *e.g.*, driving at an unusual hour or in an area with drinking establishments — we reversed the trial court's order denying the defendant's motion to suppress. *Id.* at 744, 673 S.E.2d at 768. Just two months later, in *State v. Peele*, 196 N.C. App. 668, 675 S.E.2d 682, *disc. review denied*, 363 N.C. 587, 683 S.E.2d 383 (2009), we applied a similar line of reasoning. There the defendant was pulled over at approximately 7:50 on a Saturday evening after the officer — who was responding to a dispatch alerting him to "a possible careless and reckless, D.W.I." — observed the defendant's car "weave into the center, bump the dotted line, and then fade to the other side and bump the fog line,[2] and then pretty much go back into the middle of the lane." *Id.* at 668, 671, 675 S.E.2d at 682–83. Noting that the defendant was not driving late at night and that there was no evidence that he was close to any bars, we reversed the trial court's order denying the defendant's motion to suppress. *Id.* at 674, 675 S.E.2d at 687 ("In short, all we have is a tip with no indicia of reliability, no corroboration, and conduct falling within the broad range of what can be described as normal driving behavior.") (citations and brackets omitted).

Three years later, however, in an opinion from March of 2012, we indicated that weaving only can be sufficient to arouse a reasonable suspicion of criminal activity when it is particularly erratic and dangerous to other drivers. Distinguishing *Fields 2009* and *Peele*, we determined that the officer had a reasonable suspicion sufficient to justify a stop of the defendant's vehicle when he described the defendant's car as "like a ball bouncing in a small room." *State v. Fields*, __ N.C. App. __, __,

---

2. The "fog line" is the solid white line on the outer edge of the road. Unless the driver crosses over the center line, into oncoming traffic, the fog line is always to the right of the driver's vehicle.

723 S.E.2d 777, 779 (2012) [hereinafter *Fields 2012*]. Characterizing the defendant's driving as "so erratic that . . . other drivers — in heavy traffic — [were forced to take] evasive maneuvers to avoid [the] defendant's car," we affirmed the trial court's denial of the defendant's motion to suppress. *Id.*; *see also State v. Simmons*, 205 N.C. App. 509, 525, 698 S.E.2d 95, 106 (2010) (determining that the officer had reasonable suspicion sufficient to initiate a stop when the defendant was "not only weaving within his lane, but was also weaving across and outside the lanes of travel, and at one point actually ran off the road").

Most recently, in June of 2012, our Supreme Court held that a state trooper had a reasonable and articulable suspicion sufficient to initiate a traffic stop when the defendant was "weaving constantly and continuously [within her own lane] over the course of three-quarters of a mile" and did so at 11:00 on a Friday night. *Otto*, 366 N.C. at 138, 726 S.E.2d at 828 (quotation marks omitted). In so holding, the Supreme Court distinguished the weaving plus cases described above primarily on grounds that the defendant in *Otto* "was weaving constantly and continuously over the course of three-quarters of a mile." *Id.* (quotation marks omitted). The Court also noted that the late hour — "11:00 p.m. on a Friday night [sic]" — contributed to the reasonableness of the officer's suspicion. *Id.*

### III. Analysis

In its order, the trial court recited testimony from the hearing, made findings of fact based on that testimony, and — based on those findings — concluded that Sgt. Turner had a reasonable and articulable suspicion of criminal activity when she stopped Defendant. The trial court did not correctly separate its findings of fact from its recitations of testimony and conclusions of law. This is not fatal to the trial court's order, however, and it is within our discretion to "reclassify" the trial court's findings and conclusions to assist in our review. *See N.C. State Bar v. Key*, 189 N.C. App. 80, 88, 658 S.E.2d 493, 499 (2008) ("[C]lassification of an item within the order is not determinative, and, when necessary, the appellate court can reclassify an item before applying the appropriate standard of review.").

Relevant to our discussion, the trial court included the following statement in its "find[ings of] fact": "[Sgt. Turner] . . . testified that . . . she observed that []Defendant had a blank stare when she passed him." Though the court correctly made certain findings of fact in that section of its order — e.g., that it was "[a]t or around 10:05[]" that evening" — its mere recitation of testimony as to Defendant's blank stare is not sufficient to constitute a valid finding of fact. *See Lane v. American Nat'l*

*Can Co.*, 181 N.C. App. 527, 531, 640 S.E.2d 732, 735 (2007) ("[F]indings of fact must be more than a mere summarization or recitation of the evidence and the [court] must resolve the conflicting testimony.") (citations omitted), *disc. review denied*, 362 N.C. 236, 659 S.E.2d 735 (2008). Therefore, our review is limited to those facts found by the trial court and the conclusions reached in reliance on those facts, not the testimony recited by the trial court in its order. *See generally N.C. State Bar*, 189 N.C. App. at 88, 658 S.E.2d at 499 ("[A]ny determination requiring the exercise of judgment or the application of legal principles is . . . classified a conclusion of law. Any determination reached through logical reasoning from the evidentiary facts is . . . classified a finding of fact.") (citations omitted).

In its "conclu[sion of] law" section, the trial court stated that its denial of Defendant's motion to suppress was based on "the totality of the circumstances on this occasion" — specifically, Sgt. Turner's belief that Defendant's high beam headlights had been activated, "[the fact] that [Sgt. Turner] signaled three times for the Defendant to turn them down," and the fact that Defendant "failed to maintain lane control." Accordingly, we find that the totality of the circumstances in this case present one instance of weaving, in which the right side of Defendant's tires crossed into the right-hand lane,[3] as well as two conceivable "plus" factors — the fact that Defendant was driving at 10:05 on a Wednesday evening[4] and the fact that Sgt. Turner believed Defendant's bright lights were on before she initiated the stop.[5]

---

3. Sgt. Turner's testimony is unclear and could reasonably be interpreted to suggest that Defendant's tires crossed the dividing line either as a part of his weaving or *after* the weaving. In its sixth finding of fact, however, the trial court resolved the apparent ambiguity by finding that Sgt. Turner "observed []Defendant's vehicle weave in and out of his traffic lane, *with the right tires crossing the dividing lane line*." Thus, despite the seeming ambiguity in Sgt. Turner's testimony, the trial court found that the crossing occurred in concert with — not in addition to — Defendant's solitary "weave," and we are bound by that determination. *See Williams*, 362 N.C. at 632, 669 S.E.2d at 294; *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619–20.

4. As discussed in section *II*, the time of night is a common factor to be considered on the issue of whether an officer had the necessary reasonable suspicion to justify a traffic stop.

5. Unlike its statement that Sgt. Turner *testified* to observing Defendant's blank stare, the trial court explicitly found that Sgt. Turner believed Defendant's bright lights were on. Because a court's comments regarding the testimony presented at a hearing is separate from its findings based on that testimony, we include Sgt. Turner's belief regarding the bright lights in our analysis and exclude any belief she may have had regarding Defendant's facial expression.

STATE v. DERBYSHIRE

[228 N.C. App. 670 (2013)]

In *Otto*, the Supreme Court relied primarily on the defendant's "weaving constantly and continuously over the course of three-quarters of a mile" to find that the trooper had a reasonable suspicion of the commission of a crime. *Otto*, 366 N.C. at 138, 726 S.E.2d at 828. The fact that it was approximately 11:00 p.m. on a Friday also contributed to that conclusion, but was not dispositive.[6] *See id.* Here, the facts that Defendant was driving at 10:05 on a Wednesday evening and that Sgt. Turner believed Defendant's bright lights were on are not sufficiently uncommon to constitute valid "plus" factors. The difference between 10:05 on a Wednesday and 11:00 p.m. on a Friday is slight, but not insubstantial. It is utterly ordinary for an individual to be driving on the road at 10:05 on a Wednesday evening and, without something more unusual, this factor cannot help to establish a suspicion of criminal activity in the mind of a reasonable, cautious officer. In addition, we note that many vehicles on the road today use the same sort of headlights that Defendant had — "very, very bright" halogen headlights. An increase in the likelihood that an individual may be subjected to a *Terry* stop merely because that person owns a car that "sits high off the ground" or that was built with brighter headlights, as in this case, would constitute an irrational inference of criminal activity, which we decline to adopt here. Accordingly, the fact that Defendant was driving on a Wednesday evening at 10:05 in a vehicle which had "different," brighter lights merely constitutes "conduct falling within the broad range of what can be described as normal driving behavior" and, therefore, cannot be considered in a reasonable officer's determination to initiate a *Terry* stop. *See Peele*, 196 N.C. App. at 674, 675 S.E.2d at 687 (citations and quotation marks omitted).

Therefore, our decision is limited to whether Sgt. Turner could have developed a reasonable suspicion that Defendant was in the process of committing a crime when he weaved only once, causing the right side of his tires to cross the dividing line in his direction of travel. Because one instance of weaving is neither (1) erratic and dangerous nor (2) constant and continuous under *Fields 2012* and *Otto*, respectively, we conclude that this case is governed by our prior decisions in *Fields 2009* and *Peele*. Therefore, we hold that Sgt. Turner lacked a reasonable and articulable suspicion of the commission of a crime and, thus, that the trial court erred in denying Defendant's motion to suppress. For that

---

6. In his concurring opinion, joined by Justice Jackson, Justice Newby stated that he believed the "defendant's constant and continuous weaving standing alone [was] sufficient to support [a conclusion of reasonable, articulable suspicion]." *Otto*, 366 N.C. at 138, 726 S.E.2d at 828.

reason, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

Judges MCGEE and HUNTER, JR., ROBERT N., concur.