STROUD, Judge.
 

 *892
 
 Defendant appeals from the trial court's order denying his motion to suppress all evidence recovered as a result of a traffic stop and subsequent dog sniff. Although the law enforcement officer had seen defendant's truck cross only once about one inch over the double yellow lines on a curvy road, crossing the center line is a traffic violation which is sufficient to justify the stop. After the stop, the officer's observations of defendant and additional information that defendant had drugs in the truck gave the officer reasonable suspicion to request a canine sniff of the car, and the canine officer arrived without unreasonable delay. We affirm the trial court's order.
 

 Background
 

 Defendant was indicted on trafficking in methamphetamine by transportation, trafficking in methamphetamine by possession, felonious maintaining a vehicle for keeping and/or selling a controlled substance, possession of methamphetamine, possession with intent to sell and/or deliver methamphetamine, possession of drug paraphernalia, and driving left of center on 29 February 2016. On 5 August 2016, defendant moved to suppress the traffic stop which led to his arrest based on both a lack of reasonable suspicion to justify the initial stop and on the search of defendant's vehicle after the "passage of an amount of time far in excess of any justification for said stop and seizure." The trial court held a hearing on the motion to suppress on 8 August 2016 and denied the motion both on the initial stop and to the extension of time and dog sniff. The trial court later entered a written order in accord with its rendition of the ruling on the motion to suppress in open court on 8 August 2016. Defendant reserved his right to appeal the ruling on the motion to suppress and pled guilty to all of the charges against him on or about 9 August 2016. Defendant timely filed written notice of appeal from the order denying motion to suppress and the judgment entered upon his guilty plea.
 

 Analysis
 

 On appeal, defendant challenges the trial court's conclusion of law that there was reasonable suspicion to stop defendant's vehicle. He also challenges some of the trial court's findings of fact and conclusions of law regarding the officer's questioning of defendant after the stop and contends the traffic stop was unreasonably extended beyond the time necessary for the traffic violation.
 

 *893
 
 I. Traffic stop
 

 What a difference a few inches can make in cases dealing with traffic stops. This Court and many other appellate courts have struggled with making fine distinctions between weaving within a travel lane and "weaving plus," such as weaving repeatedly within a lane, weaving and barely crossing a fog line, weaving in the wee hours of the morning, weaving near a bar, weaving while driving under the speed limit, and many other factors. The rules regarding weaving are hazy at best.
 

 *213
 
 But there is a "bright line" rule in some traffic stop cases. Here, the bright line is a double yellow line down the center of the road. Where a vehicle actually crosses over the double yellow lines in the center of a road, even once, and even without endangering any other drivers, the driver has committed a traffic violation of
 
 N.C. Gen. Stat. § 20-146
 
 (2017). This is a "readily observable" traffic violation and the officer may stop the driver without violating his constitutional rights.
 
 See, e.g.,
 

 State v. Johnson
 
 ,
 
 370 N.C. 32
 
 , 37-38,
 
 803 S.E.2d 137
 
 , 141 (2017) ("To be sure, when a defendant does in fact commit a traffic violation, it is constitutional for the police to pull the defendant over." (Citation omitted) ).
 

 Defendant challenges none of the findings of fact regarding the initial traffic stop, so they are binding on appeal:
 

 The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. However, when, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review. Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.
 

 State v. Biber
 
 ,
 
 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) (citations and quotation marks omitted).
 

 The trial court found these facts which are relevant to the traffic stop:
 

 6. Daniel Wellmon is an officer with the Jackson County Sheriff's office. Officer Wellmon received his Basic Law Enforcement Training in 2009 and has maintained that certification each year through in-service training. In addition,
 
 *894
 
 Officer Wellmon is certified to operate an Intoxilyzer and has maintained that certification as required by law.
 

 7. Officer Wellmon has worked as a Patrol officer with the Jackson County Sheriff's office since 2009 handling, among other things, serving papers, traffic stops, regular patrol duties and community patrols. During his Tenure as a Deputy Sheriff, Officer Wellmon has made in excess of 500 Chapter 20 related investigations.
 

 8. On the 13th day of January, 2015 Officer Wellmon was working a regular day shift beginning at 6 am through 6 pm. He was operating a marked Dodge Charger equipped with Blue lights, sirens, radio and a computer. His assignment for that day was to conduct a community patrol of Cabe Road because the Sheriff's office had received multiple complaints about drug activity in that area.
 

 9. That same morning Officer Wellmon was advised by a State Bureau of Investigation Agent, who was involved in drug related investigations, to be on the lookout for a black vehicle driven by [defendant]. According to the Agent, this vehicle was bringing large quantities of methamphetamine to a supplier off of Cabe Road.
 

 10. At approximately 3:09 pm on January 13, 2016, Officer Wellmon was traveling on Cabe Road behind a white Ford Ranger Pick-up truck. Cabe Road is a dead end, curvy, paved road located in Jackson County and is of sufficient width for two lanes of travel. The officer observed the Ford Ranger travel left of center with the driver's side tires crossing over the double yellow lines approximately one inch.
 

 11. Officer Wellmon activated his blue lights and the vehicle pulled into Comfort Road, a one lane gravel driveway off of Cabe Road.
 

 Defendant argues that the trial court erred in concluding that "Officer Wellmon had reasonable suspicion to stop the Defendant's vehicle for failing to operate his vehicle on the right half of the roadway that was of sufficient width for more than one lane of traffic in violation of N.C.G.S. 20-146(A)." Defendant relies heavily on
 
 State v. Derbyshire
 
 ,
 
 228 N.C. App. 670
 
 , 677,
 
 745 S.E.2d 886
 
 , 891 (2013) and contends that the facts of this case are "substantially similar, and, in fact, even less suspicious than the facts presented in
 
 Derbyshire
 
 ."
 

 *895
 

 *214
 
 But the facts of
 
 Derbyshire
 
 differ greatly from this case.
 
 Derbyshire
 
 was a "weaving plus" case in which this Court held that the officer did not have a sufficient basis for a reasonable suspicion to stop the defendant.
 

 Id.
 

 ("On a number of occasions, this Court has determined that an officer has the reasonable suspicion necessary to justify an investigatory stop after observing an individual's car weaving in the presence of certain other factors. This has been referred to by legal scholars as the 'weaving plus' doctrine." (Citation omitted) ). But the
 
 Derbyshire
 
 Court emphasized in a footnote that the defendant's car did
 
 not
 
 cross the center line of the road:
 

 The right side of Defendant's tires did not cross the line separating his lane of traffic from oncoming traffic. Rather, the tires crossed the line separating those two lanes of traffic headed in the same direction. At no point did Defendant cross the center line or the solid white line on the outer edge of the road.
 

 Id.
 
 at 675, n.1,
 
 745 S.E.2d at 890, n.1
 
 .
 
 Derbyshire
 
 and the other cases cited by defendant's brief are weaving or "weaving plus" cases; none address readily observable traffic violations.
 

 Here, the uncontested findings of fact show that the officer saw defendant's vehicle cross the double yellow lines in the center of the road, in violation of
 
 N.C. Gen. Stat. § 20-146
 
 (a). Cases from this Court and the Supreme Court have consistently held that when an officer observes a traffic violation, the officer has reasonable suspicion to stop the vehicle. In
 
 State v. Jones
 
 , the officer saw the defendant's truck cross the double yellow lines in the center of the road, " 'slightly left of center in a curve.' "
 
 State v. Jones
 
 , --- N.C. App. ----, ----,
 
 813 S.E.2d 668
 
 , 669,
 
 2018 WL 1597450
 
 , at *1 (Apr. 3, 2018) (No. COA17-796 ). This Court rejected the defendant's argument in
 
 Jones
 
 that the officer needed some additional basis for reasonable suspicion for a traffic stop where he had seen the traffic violation:
 

 Defendant's argument ... ignores the fact that Trooper Myers' direct observations provided reasonable suspicion for the vehicle stop. Under North Carolina law, Defendant's act of crossing the double yellow centerline clearly constituted a traffic violation.
 
 N.C. Gen. Stat. § 20-150
 
 (d) (2017) ("The driver of a vehicle shall not drive to the left side of the centerline of a highway upon the crest of a grade or upon a curve in the highway where such centerline has been placed upon such highway by the Department of Transportation, and is visible.").
 

 *896
 
 This Court has made clear that an officer's observation of such a traffic violation is sufficient to constitute reasonable suspicion for a traffic stop.
 

 Jones
 
 , --- N.C. App. at ----,
 
 813 S.E.2d at 672
 
 ,
 
 2018 WL 1597450
 
 , at *4 (citations omitted).
 

 Officer Wellmon saw defendant's truck cross the double yellow lines in the center of the road, which is a traffic violation, so the trial court correctly concluded that he had reasonable suspicion to stop defendant's vehicle based upon the uncontested findings of fact. This argument is without merit.
 

 II. Extension of Traffic Stop
 

 A. Findings of Fact
 

 Defendant next argues that the "trial court erred in finding and concluding that the length and scope of the stop was reasonable under the totality of the circumstances as it is not supported by competent evidence." Defendant challenges four findings of fact as not supported by the evidence. "The applicable standard in reviewing a trial court's determination on a motion to suppress is that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting."
 
 State v. Barden
 
 ,
 
 356 N.C. 316
 
 , 332,
 
 572 S.E.2d 108
 
 , 120-21 (2002) (citations and quotation marks omitted).
 

 The trial court first made these uncontested findings of fact regarding the stop itself and extension of the stop:
 

 12. Officer Wellmon approached the vehicle and identified the defendant to be the driver. Officer Wellmon noticed that [defendant] appeared confused. His speech was so fast that the officer had a difficult time understanding him. The defendant began to stutter and mumble his words.
 

 *215
 
 13. As the Defendant handed his license and registration to the Officer his hands were quivering.
 

 14. As Officer Wellmon asked the defendant questions, the defendant's eyes veered away from the officer and he would not make eye contact.
 

 15. In Officer Wellmon's opinion, the nervousness exhibited by the Defendant was much more extreme than that of any motorists he had previously stopped for a Chapter 20 violation.
 

 *897
 
 16. Officer Wellmon observed the Defendant's eyes to be bloodshot and glassy, like a mirror, and the skin underneath his eyes were ashy in appearance. The defendant, in answer to the officer's inquiry, denied consuming any impairing substance.
 

 17. Based on Officer Wellmon's training and experience, the behaviors and physical appearance of the Defendant were consistent with someone having used methamphetamine.
 

 18. When asked where he was going, the defendant told the Officer he was going to "Rabbit's" house because he had sold "Rabbit" his car and needed to collect the money.
 

 19. The Officer knew "Rabbit" to be the nickname of Archie Stanberry. Furthermore, the officer had prior knowledge that Archie Stanberry was involved with methamphetamine and had previous drug charges involving methamphetamine. Officer Wellmon also knew that Archie Stanberry's house was located at Shadrack Lane, which is in close proximity to Cabe Road.
 

 20. That the defendant had a small dog in his vehicle that was barking and growling at the officer. When the Officer asked if the dog would bite, the defendant, of his own volition, got out of his vehicle. Officer Wellmon testified that it is unusual for someone to exit their vehicle without being requested to do so by the Officer.
 

 21. Because of concerns for officer safety, Officer Wellmon asked the defendant if he could pat him down for weapons. The defendant said he did not mind. During the process of checking for weapons, the defendant talked the entire time, stuttered and the officer was unable to understand anything he said.
 

 22. The officer asked the defendant to walk to the back of his truck and as he did so, the defendant placed his hand on the vehicle for stability. When he reached the back of his vehicle, the defendant leaned on the tailgate.
 

 23. Officer Wellmon did not perform field sobriety tests or seek a breath or blood sample from [defendant].
 

 24. Officer Wellmon then asked the defendant for consent to search and the defendant denied that request.
 

 *898
 
 25. Officer Wellmon, requested Sgt. Kenneth Woodring, who had just arrived on the scene, to make contact with a Canine Unit. Jackson County Sheriff's Office did not have a canine at that time. Macon County was closest to the location, but their canine was unavailable. At 3:17, Officer Wellmon was told that a canine from Cherokee was on the way.
 

 26. Officer Wellmon went to his patrol vehicle to check on the validity of the defendant's license, registration and for any outstanding warrants. Before getting into his vehicle and while his driver's side door was open, Mallory Gayosso, approached Officer Wellmon and told him "that was Archie's dope in the vehicle".
 

 27. Officer Wellmon knew that Ms. Gayosso lived near where the officer and the defendant were parked on Comfort Road. He also knew that Ms. Gayosso has given drug information to law enforcement in the past.
 

 28. Approximately 6 minutes later, while Officer Wellmon was conducting his license and record checks, Ms. Gayosso approached him once again. She told him she had just walked down to Cabe Road from Comfort Road to get milk from her mother. Ms. Gayosso told Officer Wellmon that she had "just got off the phone Rabbit" Archie Stanberry, and that "there was dope in the vehicle and it was in a black tackle box and not to let us find it." Ms. Gayosso continued to walk back to her home.
 

 *216
 
 29. During this time, the defendant remained standing at the back of his vehicle speaking with Sgt. Woodring.
 

 Defendant challenges the next four findings as not supported by the evidence.
 

 30. Officer Wellmon ran an inquiry on the defendant's license from Jackson County Dispatch, ran a driver's history on C.J. Leads, checked for any outstanding warrants on N.C. AWARE and NCIC. He determined the defendant's license and registration were valid and there were no outstanding warrants for his arrest. The defendant's license and registration were not returned to him. This process takes officer Wellmon 15 minutes.
 

 *899
 
 31. Within six to seven minutes after making that determination, Sgt. Rick Queen from Cherokee Police Department's NRE Division arrived with his canine Bogart. Officer Wellmon testified the Sergeant and his canine arrived at approximately 3:47 pm.
 

 32. That based on his training and experience and the totality of the circumstances, Officer Wellmon had reasonable suspicion to justify extending the stop until a canine unit arrived.
 

 33. That six to seven minutes is a reasonable amount of time, following the completion of the officer's Chapter 20 investigation, to detain the Defendant based on the Officer's reasonable suspicion to believe criminal activity is afoot.
 

 Defendant does not challenge the events described in these findings but only the trial court's findings regarding the exact timing of the events. The trial court found that defendant was detained only "six to seven" minutes after Officer Wellmon completed the Chapter 20 investigation. The court also found that "six to seven minutes" after completion of the Chapter 20 investigation was a reasonable amount of time to detain defendant while waiting for the canine officer, based upon Officer Wellmon's reasonable suspicion to believe that defendant was engaging in criminal activity. Defendant argues that "[i]n the thirty minutes from the arrival of the Sergeant to the arrival of the canine unit, Officer Wellmon could have issued a citation" and defendant should have been released. By defendant's calculations, "[i]t was a full fifteen minutes after" 3:32 pm, or 3:47 pm, "when Officer Queen even arrived on the scene with the dog[,]" not "six or seven" minutes. The State notes that although there was some confusion in the testimony regarding exact timing of the events, ultimately Officer Wellmon clarified his testimony about how long he took to check the information on the computer and when he completed the Chapter 20 investigation. Officer Wellmon testified:
 

 Q. Did you have an occasion at that juncture [after receiving information about defendant's license, registration, or outstanding warrants] to estimate how long it was before the K-9 arrived?
 

 A. Yes.
 

 Q. About how long was it before the K-9 arrived?
 

 *900
 
 A. I would say 15.
 

 Q. After you had completed running all the information, correct?
 

 A. Yeah. Once I completed the information, it was probably six-six, seven minutes.
 

 Q. Okay. I guess I'm somewhat confused. I asked a second ago: How long after you finished running all the information was it before the K-9 arrived?
 

 A. Oh, excuse me. Six to seven minutes.
 

 Q. You had said 15 minutes.
 

 A. I'm sorry. I got confused.
 

 If there was any conflict in the testimony about the timing of events, the trial court resolved that conflict in the findings of fact. "It is well established that the trial court resolves conflicts in the evidence and weighs the credibility of evidence and witnesses."
 
 Jones
 
 , --- N.C. App. at ----,
 
 813 S.E.2d at 670
 
 ,
 
 2018 WL 1597450
 
 , at *2 (citation and quotation marks omitted). The evidence supports the trial court's findings as to the timing of the traffic stop and extension.
 

 B. Conclusions of law
 

 Defendant argues next that even if the extension of time was only six or seven minutes, the trial court erred in concluding that "Officer Wellmon had reasonable suspicion
 
 *217
 
 to further question the defendant in that under the totality of the circumstances there existed reasonable articulable suspicion to indicate that criminal activity was afoot" and that "Officer Wellmon had reasonable suspicion to detain the defendant until the arrival of the canine officer and the delay was not unreasonable under the totality of the circumstances in this case." Defendant contends that the extension of the stop during and after the Chapter 20 investigation was "unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution and case law interpreting same." Defendant's argument is based primarily on
 
 Rodriguez v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015).
 

 In
 
 Rodriguez
 
 , the United States Supreme Court addressed "the question [of] whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop."
 
 Id
 
 . at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . The Court held that if a "police stop exceed[s] the time needed to handle the matter for which the stop was made,"
 

 *901
 
 the stop "violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 (citation, quotation marks, and brackets omitted).
 

 Defendant contends that the "factual scenario in
 
 Rodriguez
 
 is very similar" to his case. In
 
 Rodriguez
 
 , a police officer saw a vehicle "veer slowly onto the shoulder" of a highway "for one or two seconds and then jerk back onto the road."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . Because state law prohibited driving on the shoulder of a highway, the officer stopped Rodriguez for this traffic violation at about 12:06 a.m.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . The officer was a canine officer and his dog was with him in his patrol car.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . The officer approached Rodriguez's vehicle and got his license, registration and proof of insurance.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . He then ran a record check and returned to the vehicle to get the passenger's license and question him about where they were coming from and where they were going.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . The officer returned to his patrol car to run a record check on the passenger and called for a second officer.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . He returned to Rodriguez's vehicle a third time to issue a written warning ticket at about 12:27 or 12:28 am.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . At that point, the officer acknowledged that he had taken care of " 'all the reason[s] for the stop[.]' "
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . But then he asked for permission to walk his dog around defendant's car, and Rodriguez said no.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . He had Rodriguez get out of the car and wait for the second officer to arrive.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . At 12:33 a.m., the second officer arrived and the first officer had his canine sniff the car; the canine alerted, leading to the discovery of a "large bag of methamphetamine."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . The entire stop took about twenty-seven minutes prior to the dog sniff, and the stop was extended by about seven to eight minutes after completion of the investigation of the traffic violation for the dog sniff.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1614
 
 ,
 
 191 L.Ed.2d at 498
 
 .
 

 Defendant argues that here, the entire stop was about forty-one minutes, and it was extended six to seven minutes for the dog sniff, so under
 
 Rodriguez
 
 , it was unreasonable because its duration was too long. Defendant argues that "based upon the totality of the circumstances,
 
 *902
 
 performing these functions by checking a driver's information and issuing a traffic citation for driving left of center should reasonably have been completed in less than forty-one minutes." Defendant does not explain how he contends that Officer Wellmon could have completed the Chapter 20 portion of the stop more quickly or why the length of the Chapter 20 portion of the stop was unreasonable under the totality of the circumstances. But even if the stop could have been completed more quickly, defendant ignores a crucial part of the
 
 Rodriguez
 
 analysis. The Court held that the officer may
 
 *218
 
 not conduct the traffic stop "in a way that prolongs the stop,
 
 absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
 
 "
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 .
 

 In
 
 Rodriguez
 
 , based upon the findings made by the district court, there were no other circumstances which could have given the officer a basis for reasonable suspicion of any crime other than the initial traffic stop; Rodriguez had merely driven on the shoulder of the road for one or two seconds, which was a traffic violation, but there were no other facts which might arouse suspicion of wrongdoing.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . The district court found that " 'Officer Struble had [no]thing other than a rather large hunch' " and determined that "no reasonable suspicion supported the detention once Struble issued the written warning."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 ,
 
 191 L.Ed.2d at 497
 
 . But the Supreme Court specifically noted that if a law enforcement officer has a basis for reasonable suspicion which develops during the stop, the stop can be extended accordingly.
 

 Id.
 

 at ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d at 499
 
 .
 

 As in
 
 Rodriguez
 
 , the dog sniff here extended the stop. But the Supreme Court noted that the next inquiry was "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation," and since the Eighth Circuit Court of Appeals had not reviewed the district court's conclusion on this issue, the Supreme Court remanded the case for review of this issue.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616-17
 
 ,
 
 191 L.Ed.2d at 501
 
 .
 

 Unlike in
 
 Rodriguez
 
 , here the trial court addressed the basis for reasonable suspicion to extend the stop. Defendant's argument ignores the many uncontested findings of fact which support the trial court's conclusion that Officer Wellmon had reasonable suspicion to extend the stop for the dog sniff. Officer Wellmon was patrolling Cabe Road based upon complaints about drug activity and he had been advised by the State Bureau of Investigation to be on the lookout for defendant based upon reports he was "bringing large quantities of methamphetamine to a
 
 *903
 
 supplier off of Cabe Road." After he stopped the truck, Officer Wellmon identified defendant as the person he was on the lookout for and noticed defendant was confused, spoke so quickly he was hard to understand, and began to "stutter and mumble his words."
 
 [1]
 
 Defendant did not make eye contact when talking to Officer Wellmon and his nervousness was "much more extreme" than that of most drivers stopped by the officer. His eyes were bloodshot and glassy and the skin underneath his eyes was ashy. Based upon his training and experience, Officer Wellmon believed defendant's "behaviors and physical appearance" were consistent with methamphetamine use. Defendant told Officer Wellmon he was going to "Rabbit's" house, and Officer Wellmon knew that "Rabbit" was involved with methamphetamine and that he lived nearby. When defendant got out of the car-without having been asked-he put his hand on the car for stability. And although these facts alone would have given Officer Wellmon reasonable suspicion, at this point a woman Officer Wellmon knew had given "drug information to law enforcement in the past" approached and told him she had talked to Rabbit and defendant had "dope in the vehicle and it was in a black tackle box" and not to let the police find it. These facts were more than sufficient to give Officer Wellmon a reasonable suspicion that defendant may have drugs in his vehicle and to justify a dog sniff, and the trial court's conclusions of law were supported by the findings of fact. This argument is also without merit.
 

 Conclusion
 

 We affirm the trial court's order denying defendant's motion to suppress.
 

 AFFIRMED.
 

 Judges BRYANT and CALABRIA concur.
 

 [1]
 

 The SBI had told Officer Wellmon to be on the lookout for defendant in a black vehicle, but defendant was the registered owner of the white truck he was driving when he was stopped.