IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-655
No. COA21-519

Filed 4 October 2022

Guilford County, Nos. 17CRS91797, 19CRS75852-55, 19CRS77074

STATE OF NORTH CAROLINA

v.

KYLE EARL PARKER, Defendant.

Appeal by defendant from order entered 19 January 2021 by Judge Andrew Heath and from judgments entered 27 January 2021 by Judge William A. Wood II in Superior Court, Guilford County. Heard in the Court of Appeals 10 May 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Neal T. McHenry, for the State.*

*Shawn R. Evans for defendant-appellant.*

STROUD, Chief Judge.

¶ 1 Defendant Kyle Earl Parker appeals from two judgments for attempted heroin trafficking by possession, possession of a firearm by a felon, and other charges entered following guilty pleas, one of which was an "Alford guilty plea," that preserved his right to appeal an order denying his Motion to Suppress. Pursuant to his plea arrangement, Defendant also appeals the order denying his Motion to Suppress. Because (1) the trial court's Findings of Fact are supported by competent evidence,

(2) the area adjacent to a gas pump at a service station is a public vehicular area under North Carolina General Statute § 20-4.01(32) (eff. 12 July 2017 to 20 June 2019) and (3) the trial court's Findings of Fact support its Conclusions of Law finding probable cause, we affirm the trial court's order denying the Motion to Suppress.

## I.    Background

As to the drug and firearm possession charges at issue in this appeal,[1] the State's evidence from the suppression hearing tended to show Detective King and Master Corporal R.S. Cole of the Guilford County Sheriff's Office were part of a narcotics investigation into "several folks" including Defendant and Ms. Dalya Van. The investigation began at the start of May 2019 and initially focused on Ms. Van and others because a "confidential and reliable informant" made a series of "controlled purchases of illegal narcotics," including heroin, "from Ms. Van and possibly others."

As part of this investigation, on 28 May 2019 the informant contacted Ms. Van about purchasing a kilogram of heroin, with Corporal Cole listening on speaker phone. During this conversation, the informant arranged to meet Ms. Van at a hotel to get a sample of the drugs. At the hotel, Ms. Van joined the informant in their car,

---

[1] The other conviction consolidated in the judgment is for malicious conduct by a prisoner. This charge was from an "unrelated 2017 case." Since that charge is unrelated to the suppression order and the drug and firearms convictions it supports on appeal here, we do not discuss the malicious conduct charge any further.

and they traveled, with police officers including Detective King following, to apartments where a black SUV pulled up to meet them. After other officers told Detective King that Ms. Van had gotten out of her vehicle and into a "black SUV," specifically a 2019 Chevrolet Tahoe, Detective King drove past the black SUV to get its license plate number and reported it to Corporal Cole. Corporal Cole then "ran the registration plate through the system" and connected the black SUV to Defendant. He also had previously received information about Defendant during this drug investigation. Corporal Cole then informed the other officers, including Detective King, of the connection between the black SUV and Defendant as well as the information Corporal Cole had received about Defendant as part of the drug investigation. Ms. Van then got out of the black SUV and into the car she came in, and both vehicles left.

¶ 4        After Ms. Van and the informant got back to the hotel, Ms. Van left, and the police met with the informant to get the sample Ms. Van had given them. Corporal Cole tested the sample and confirmed it was heroin. The informant then arranged with Ms. Van to purchase two kilograms of heroin at the same hotel. At this point, Corporal Cole told the police officers conducting surveillance, including Detective King, to look out for the black SUV. Detective King then set up on the "one main road" leading to the hotel.

¶ 5        During this surveillance, Detective King's car ran low on gas, so he drove

across the street from his lookout position to a gas station. At the gas station, Detective King saw Defendant and the black SUV, which he confirmed had the same license plate number, "at or about the same time that the source" with the larger supply of heroin was supposed to arrive at the hotel across the street. Detective King then alerted Corporal Cole, who told Detective King that the police "Special Emergency Response Team" ("SERT") would be there soon to detain Defendant.

¶ 6        Once SERT arrived and detained Defendant, Detective King walked around to the passenger side of Defendant's vehicle because the police "were specifically interested" in the larger supply of heroin they "had ordered" and that they "assum[ed] [Defendant] was bringing." Once there, Detective King smelled vinegar—which in his "training and experience" is what heroin smells like—through the open window and saw "what appeared to be . . . two kilograms of heroin" in a cereal box based on his training and experience about how drugs are packaged. Detective King notified Corporal Cole of the suspected heroin, and Corporal Cole joined him at the gas station. Corporal Cole also observed what appeared to be heroin in a cereal box in the front seat and smelled through the open window "a distinct odor" that "in [his] training and experience . . . smelled like heroin." After taking pictures at the scene, Corporal Cole searched the vehicle and recovered a little more than two kilograms of heroin from the cereal box as well as a loaded gun, cell phones, and paperwork with Defendant's name on it. The police then arrested Defendant based on the items

recovered from the search.

¶ 7        On 5 August 2019, Defendant was indicted for possession of a firearm by a felon, possession of a stolen firearm, two counts of trafficking opium or heroin by possession and by transportation, maintaining a vehicle used for keeping and selling a controlled substance, and conspiracy to traffic opium or heroin.

¶ 8        Following his indictment, Defendant filed a Motion to Suppress on 25 November 2020. Specifically, Defendant challenged the search of his vehicle and seizure of property therefrom on the grounds the search was without a warrant or any "other lawful justification" and therefore violated the Fourth Amendment of the United States Constitution as well as the North Carolina Constitution.

¶ 9        On 3 December 2020, the trial court held a hearing on Defendant's Motion to Suppress. At the hearing, the State's two witnesses were Corporal Cole and Detective King. They testified to the events recounted above.

¶ 10        Following this testimony, the trial court heard arguments from Defendant's counsel and from the State. Defendant's attorney argued the officers' testimony conflicted on whether Ms. Van arrived on her own or with the confidential informant, and the police did not have sufficient evidence to link the black SUV to Defendant. Specifically regarding the suppression motion, counsel argued officers did not have probable cause to arrest Defendant for drug trafficking immediately upon seeing him at the gas station—although she conceded the officers could properly arrest

Defendant on outstanding warrants—such that the officers could not search the vehicle for evidence related to an arrest on drug trafficking charges. Defendant's counsel then argued the contraband was not in plain view following Defendant's arrest. Finally, Defendant's attorney argued there were no exigent circumstances so the police could have obtained a search warrant first. Based on these arguments, Defendant contended "the contraband discovered in the vehicle should be suppressed in this case."

¶ 11 The State argued based on the totality of the circumstances, the officers had probable cause to detain Defendant and search the vehicle. The prosecutor also clarified the search was valid under the automobile exception, instead of as a search incident to arrest, so the officers only needed probable cause.

¶ 12 On 19 January 2021, the trial court entered an order denying the Motion to Suppress. Defendant challenges the trial court's Findings of Fact 1, 7–10, and 13–14. In Finding 1, the trial court found the testimony of both officers "to be credible." Findings 7–14 recount Ms. Van meeting with the informant, arranging for a sample that later tested positive as heroin, and the police observing the black SUV associated with Defendant when Ms. Van got in it to retrieve the sample. Defendant does not challenge the remaining Findings of Facts. The unchallenged Findings recount the background of the investigation, the informant ordering the larger quantity of heroin and associated surveillance, Detective King identifying Defendant and the black SUV

at the gas station as well as Defendant's subsequent detention, and the smell of vinegar and sight of heroin in the car by both officers leading to the search of the car and recovery of the heroin and other items listed above.

¶ 13   From all the Findings of Fact, the trial court concluded "[t]he search of the vehicle that ultimately led to recovery of the contraband was supported by probable cause." Specifically, the trial court concluded police had probable cause "to conduct a search of the vehicle being driven by the Defendant, including the passenger seat area of the vehicle, the console and other areas where the contraband including the heroin and firearm were found" because of:

> the time and location of the encounter with the Defendant; the Defendant's connection with the Tahoe; the officers' observation of the Tahoe being involved in a heroin transaction earlier in the day; observation of the Defendant driving the Tahoe alone; an odor consistent with heroin emanating from the vehicle; and a substance consistent with heroin observed by the officers in plain view inside the vehicle . . . .

On those grounds, the trial court denied Defendant's Motion to Suppress.

¶ 14   Following the trial court's denial of his Motion to Suppress, Defendant accepted a plea deal to reduced charges of: two counts of attempting to traffic by possession of 28 or more grams of heroin, and one count each of possession of a firearm by a felon, conspiracy to possess heroin, and malicious conduct by a prisoner. The prosecutor summarized the facts to support Defendant's guilty plea in a manner that

aligned with the testimony at the suppression hearing and the trial court's order denying Defendant's Motion to Suppress. Pursuant to the plea agreement, Defendant "reserve[d] his right to appeal" the denial of the Motion to Suppress. The trial court sentenced Defendant to 60 to 84 months on the first attempt to traffic heroin charge and 60 to 84 months, to run consecutively, on the consolidated remaining charges. Defendant gave notice of appeal as to both the judgments and the denial of his Motion to Suppress in open court.

## II. Analysis

¶ 15        Defendant challenges two aspects of the trial court's order denying his Motion to Suppress. First, Defendant contends Findings of Fact 1, 7–10, and 13–14 "are not supported by competent evidence." (Capitalization altered.) Second, Defendant argues the trial court erred in its Conclusion of Law that probable cause supported the police officers' search of the black SUV. After reviewing these arguments, we determine that the trial court did not err and therefore affirm the denial of Defendant's Motion to Suppress.

### A. Standard of Review

¶ 16        As our Supreme Court has recently explained:

> When considering on appeal a motion to suppress evidence, we review the trial court's factual findings for clear error and its legal conclusions de novo. *State v. Williams*, 366 N.C. 110, 112, 726 S.E.2d 161, 166 (2012). This requires us to examine "whether competent evidence supports the trial

court's findings of fact and whether the findings of fact
support the conclusions of law." *State v. Biber*, 365 N.C.
162, 167–68, 712 S.E.2d 874, 878 (2011) (citing *State v.
Brooks*, 337 N.C. 132, 140–41, 446 S.E.2d 579, 585 (1994)).

*State v. Reed*, 373 N.C. 498, 507, 838 S.E.2d 414, 421 (2020). When "the trial court's

findings of fact are not challenged on appeal, they are deemed to be supported by

competent evidence and are binding on appeal." *Biber*, 365 N.C. at 168, 712 S.E.2d

at 878.

¶ 17    When the trial court's findings of fact are challenged on appeal and the

reviewing court must determine whether they are supported by competent evidence,

*Reed*, 373 N.C. at 507, 838 S.E.2d at 421, the court examines whether evidence in the

record can support the findings "even where the evidence might sustain findings to

the contrary." *State v. Hall*, 268 N.C. App. 425, 428, 836 S.E.2d 670, 673 (2019). This

reflects the standard that "[e]ven if 'evidence is conflicting,' the trial judge is in the

best position to 'resolve the conflict.'" *Williams*, 362 N.C. at 632, 669 S.E.2d at 294

(quoting *State v. Smith*, 278 N.C. 36, 41, 178 S.E.2d 597, 601 (1971)). "Indeed, an

appellate court accords great deference to the trial court in this respect because it is

entrusted with the duty to hear testimony, weigh and resolve any conflicts in the

evidence, find the facts, and, then based upon those findings, render a legal decision."

*State v. Derbyshire*, 228 N.C. App. 670, 673, 745 S.E.2d 886, 889 (2013) (alteration

omitted) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619–20 (1982)).

**B. Challenged Findings of Fact**

¶ 18        Defendant first challenges seven Findings of Fact (Findings 1, 7–10, 13–14) from the trial court's order denying the Motion to Suppress.  We review the challenged Findings to determine whether they are supported by competent evidence.  *Reed*, 373 N.C. at 507, 838 S.E.2d at 421.

¶ 19        Finding of Fact 1 states: "The Court finds the testimony of Detective King ('King') and Master Corporal Cole ('Cole'), to be credible."  Defendant claims "[t]his finding disregards the inconsistent testimony of the two officers about how Ms. Van arrived in the parking lot where the black [SUV] was first observed, how she entered the vehicle, and how she returned to meet with the informant."  Essentially, Defendant argues that if there is any inconsistency between the testimonies of Detective King and Master Corporal Cole, the trial court cannot consider *both* to be credible; the trial court must pick one to believe and must disbelieve the other.  But determinations of credibility are not so simplistic, and two witnesses can be "credible" even if there are slight factual differences in their testimonies.  Different witnesses may have different knowledge and viewpoints and may present facts in a slightly different way, but differences in the details of their testimony alone do not render one or both the witnesses not "credible."  The trial court has the role of sorting out the evidence and testimony, including any variations between the facts as stated by one witness and another, and making findings as to any facts relevant to the issues

presented in the case. This Court does not resolve issues with the credibility of witnesses; that is the trial court's role. *See State v. Veazey*, 201 N.C. App. 398, 402, 689 S.E.2d 530, 533 (2009) ("Weighing the credibility of witnesses and resolving conflicts in their testimony is precisely the role of the superior court in ruling on a motion to suppress." (citing *State v. Chamberlain*, 307 N.C. 130, 143, 297 S.E.2d 540, 548 (1982))); *see also Williams*, 362 N.C. at 632, 669 S.E.2d at 294 ("Even if evidence is conflicting, the trial judge is in the best position to resolve the conflict." (quotations and citation omitted)).

¶ 20        Finding of Fact 7 states: "Without knowing that the informant was working with law enforcement, Van met with the informant and agreed to retrieve the sample heroin to bring back to the informant so that the informant could confirm the quality of the heroin before ordering a substantial amount." Both Detective King and Corporal Cole testified about police setting up a meeting with Ms. Van through the confidential informant to purchase drugs. Both officers also testified about Ms. Van meeting with the informant and going to get a sample of the drug with the plan to then buy a larger amount. This Finding is supported by the evidence.

¶ 21        Finding of Fact 8 states: "After meeting with the informant, Van drove to the location of the heroin source to retrieve the sample and return it to the informant. King followed and surveilled Van as she completed this task." Detective King testified that he followed and surveyed Ms. Van. Corporal Cole also testified about

Ms. Van driving to get the sample of the heroin, giving it to informant, and the police surveillance in effect at the time.

Finding of Fact 9 states:

> King followed Van to the parking lot of an apartment building where Van was to meet her heroin source. Several other officers positioned themselves throughout the area conducting their own surveillance and covering the entire lot. King was in radio contact with Cole and the other officers throughout this portion of the investigation.

Corporal Cole and Detective King testified about King following Ms. Van's vehicle to an apartment parking lot, several other officers conducting surveillance of the area, and the constant radio contact between the officers.

Finding of Fact 10 states:

> Once in the parking lot of the apartment building, Van exited her vehicle and entered a black SUV. Believing that the black SUV was the location from which Van was retrieving the sample of heroin, King observed the black SUV's vehicle registration plate displaying [number redacted] and communicated the same to Cole."

Detective King testified he could see Ms. Van's vehicle pull into the parking lot and other officers told him she got "into a black SUV." Based on other officers' "assumption" the black SUV was "who [Van] was meeting with to retrieve the sample," he drove by and noted the SUV's license plate number. Corporal Cole also testified Van got into the black SUV and another officer told him the license plate number, which was the same as Detective King had testified.

¶ 24    Finding of Fact 13 states:

> After a short time, Van exited the Tahoe and returned to
> her vehicle. The officers attempted to follow both vehicles
> and were able to maintain constant physical surveillance
> on Van back to a predetermined location arranged by the
> informant. The officers were unable to maintain constant
> physical surveillance on the Tahoe.

Corporal Cole testified after "a very short period of time" Ms. Van left the black SUV and got back into the vehicle in which she came. Both he and Detective King testified about the attempt to follow both vehicles before losing track of the Tahoe.

¶ 25    Finally, Finding of Fact 14 states: "After Van and the informant met, the informant brought the sample heroin retrieved by Van to Cole and other officers, who field tested and confirmed the sample to be heroin." Both Detective King and Corporal Cole testified about the police getting the sample from the informant, with King testifying he originally received this information from Cole. Corporal Cole testified a field test on the sample was positive for heroin.

¶ 26    Defendant argues Findings 7–10, 13–14 "are concerning because all factually determine that Ms. Van traveled alone when she went to the parking lot of the apartment complex where she entered and exited the black [SUV]," which conflicts with testimony from Detective King and Corporal Cole. As we have explained, competent evidence supports each of the challenged Findings, and the trial judge is in the best position to resolve conflicting evidence. *Williams*, 362 N.C. at 632, 669

S.E.2d at 294. Further, it is not even clear to us these Findings conflict with the evidence as to whether Ms. Van was alone in her vehicle. The Findings of Fact do not specifically say Ms. Van traveled alone, only that, for example, she "drove to the location of the heroin source to retrieve a sample and return it to the informant." This could have occurred with the informant in the same vehicle as Detective King and Corporal Cole testified. And even if there is an inconsistency between the versions of how Ms. Van traveled, the trial court also must determine the weight of the evidence. *See Derbyshire*, 228 N.C. App. at 673, 745 S.E.2d at 889 ("Indeed, an appellate court accords great deference to the trial court in this respect because it is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision."). The evidence supports the trial court's Findings, even if there is some inconsistency between the facts as to Ms. Van in the testimony of the two officers. Therefore, we reject all of Defendant's challenges to the Findings of Fact.

**C. Conclusion of Law Regarding Search as Supported by Probable Cause**

In addition to his argument challenging certain Findings of Fact, Defendant contends "the Conclusions of Law regarding the search of the black [SUV] are not supported by probable cause." (Capitalization altered.)

Although generally searches without warrants violate the Fourth Amendment, certain circumstances allow for warrantless searches. *See Coolidge v. New*

*Hampshire*, 403 U.S. 443, 454–55, 29 L. Ed. 2d 564, 576 (1971) ("Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" (quoting *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585 (1967))). One such doctrine is the automobile exception, which states, "A search of a motor vehicle which is on a public roadway or in a public vehicular area is not in violation of the [F]ourth [A]mendment if it is based on probable cause, even though a warrant has not been obtained."[2] *State v. Isleib*, 319 N.C. 634, 637–38, 356 S.E.2d 573, 576 (1987) (quoting *Cardwell v. Lewis*, 417 U.S. 583, 595, 41 L. Ed. 2d 325, 338 (1974)). The automobile exception to the warrant requirement "is founded upon two separate but related reasons: the inherent mobility of motor vehicles which makes it impracticable, if not impossible, for a law enforcement officer to obtain a warrant for the search of an automobile while the automobile remains within the officer's jurisdiction, [*Carroll v. United States*, 267 U.S. 132, 69 L. Ed. 543 (1925)],

---

[2] Defendant also argues another exception to the warrant requirement, search incident to arrest, *State v. Carter*, 200 N.C. App. 47, 50–51, 682 S.E.2d 416, 419 (2009) ("[A] well-recognized exception to the warrant requirement is a search incident to a lawful arrest." (quotations and citation omitted)), "is invalid" here. *See also Arizona v. Gant*, 556 U.S. 332, 351, 173 L. Ed. 2d 485 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."). But as Defendant himself admits the trial court did not analyze this exception, and we will not review this argument.

and the decreased expectation of privacy which citizens have in motor vehicles, *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)." *Isleib*, 319 N.C. at 637, 356 S.E.2d at 575–76.

¶ 29        While the automobile exception does not require a warrant, it requires that the vehicle be in a public vehicular area and the police have probable cause. *Id.*, 319 N.C. at 638, 356 S.E.2d at 576. "Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *State v. Downing,* 169 N.C. App. 790, 795, 613 S.E.2d 35, 39 (2005) (quotations, citations, and alterations from original omitted); *see also Illinois v. Gates*, 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543 (1983) (stating probable cause can also relate to a belief "that contraband or evidence is located in a particular place"). As part of the probable cause determination, courts can consider "plain" observations made by police officers based on their senses. *See Downing*, 169 N.C. App. at 796, 613 S.E.2d at 39 ("Plain smell of drugs by an officer is evidence to conclude there is probable cause for a search."); *cf. Carter*, 200 N.C. App. at 54, 682 S.E.2d at 421 (explaining "plain view" as a separate exception to the warrant requirement (quotations and citation omitted)).

¶ 30        Within this framework, Defendant contends the trial court erred in two ways. First, Defendant argues the automobile exception to the warrant requirement should

not apply because his vehicle was not "stopped in a public vehicular area." Second, Defendant challenges the trial court's conclusion the officers had probable cause. As part of his challenge to the trial court's probable cause determination, Defendant argues the trial court improperly relied on the plain view and smell doctrines. We review each argument in turn.

### 1. *Applicability of Automobile Exception*

Defendant argues the trial court should not have applied the automobile exception because it only applies to vehicles in a "public vehicular area" and the black SUV was parked next to a fuel pump, which Defendant contends is not such an area. In North Carolina, "public vehicular area" is defined by statute. N.C. Gen. Stat. § 20-4.01(32) (eff. 12 July 2017 to 20 June 2019). Because the definition is provided in the statute, this issue presents a question of statutory interpretation, which we review *de novo*. *State v. Jamison*, 234 N.C. App. 231, 238, 758 S.E.2d 666, 671 (2014) ("Issues of statutory construction are questions of law, reviewed de novo on appeal." (quotations and citation omitted)).

Our statutes in effect at the time of Defendant's offense defined "Public Vehicular Area" in pertinent part as:

> Any area within the State of North Carolina that meets one or more of the following requirements:
>
> a. The area is used by the public for vehicular traffic at any time, including by way of illustration and not limitation

any drive, driveway, road, roadway, street, alley, or parking lot upon the grounds and premises of any of the following:

> 1. Any public or private hospital, college, university, school, orphanage, church, or any of the institutions, parks or other facilities maintained and supported by the State of North Carolina or any of its subdivisions.

> 2. Any service station, drive-in theater, supermarket, store, restaurant, or office building, or any other business, residential, or municipal establishment providing parking space whether the business or establishment is open or closed.

> 3. Any property owned by the United States and subject to the jurisdiction of the State of North Carolina. (The inclusion of property owned by the United States in this definition shall not limit assimilation of North Carolina law when applicable under the provisions of Title 18, United States Code, section 13).

N.C. Gen. Stat. § 20-4.01(32).

¶ 33    This Court recently noted our Supreme Court's guidance on statutory interpretation as follows:

> [t]he intent of the Legislature controls the interpretation of a statute. When a statute is unambiguous, this Court will give effect to the plain meaning of the words without resorting to judicial construction. [C]ourts must give [an unambiguous] statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein.

*Jamison*, 234 N.C. App. at 238, 758 S.E.2d at 671 (alterations in original) (quoting

*State v. Davis*, 364 N.C. 297, 302, 698 S.E.2d 65, 68 (2010)).

¶ 34        Defendant contends that "[a] fuel pump is not a driveway, road, alley, or parking lot, and is therefore not a public vehicular area." Defendant is certainly correct the "fuel pump" at a service station is not "a driveway, road, alley, or parking lot." But Defendant misstates the issue by substituting the areas listed in the statute "by way of illustration and not limitation" as the only areas defined as "public vehicular area." N.C. Gen. Stat. § 20-4.01(32).

¶ 35        North Carolina General Statute § 20-4.01(32) defines "public vehicular area" as

> [t]he area [ ] used by the public for vehicular traffic at any time . . . upon the grounds and premises of any of the following:
>
> . . . .
>
> 2. Any service station, drive-in theater, supermarket, store, restaurant, or office building, or any other business, residential, or municipal establishment providing parking space whether the business or establishment is open or closed.

¶ 36        The statute's list of types of areas "by way of illustration and *not limitation*" includes "any drive, driveway, road, roadway, street, alley, or parking lot," N.C. Gen. Stat. § 20-4.01(32) (emphasis added), but these areas are not the definition of "public vehicular area"; they are illustrations of the types of areas which may be included, but "public vehicular area" is not limited to these areas.

¶ 37        Defendant's SUV was parked beside a fuel pump at a gas station on the paved area open to the public for drivers to park close enough to the fuel pump to reach the car with the hose from the pump. Thus, the question presented is whether the parking and driving area adjacent to a fuel pump where Defendant's SUV was parked is an area "used by the public for vehicular traffic at any time" and is on the premises of "[a]ny service station," "store" or "any other business . . . establishment . . . providing parking space." Phrased correctly, this question answers itself.

¶ 38        The plain meaning of "service station" is a gas station. Gas stations sell gas dispensed from fuel pumps to the public, so by its plain meaning the definition of "public vehicular area" includes the area for driving or parking adjacent to gas pumps. In fact, the primary purpose of the area adjacent to gas pumps at a service station is to be "used by the public for vehicular traffic"; gas pumps provide fuel for vehicles. We are bound by this plain meaning. *Jamison*, 234 N.C. App. at 238, 758 S.E.2d at 671 ("Courts must give an unambiguous statute its plain and definite meaning . . . ." (alterations in original omitted)).

¶ 39        Several other factors further reinforce our interpretation of the plain meaning of this statute, indicating the legislature's intent that the public vehicular areas at a "service station" should include the paved area adjacent to the fuel pumps. *See id.* ("The intent of the legislature controls the interpretation of a statute." (alteration in original omitted)). The definition specifically notes "driveway[s]" and "parking lot[s]"

on the premises of stores generally and service stations specifically are included, N.C. Gen. Stat. § 20-4.01(32), so these portions of the definition would apply to the area between the entry to the service station property, off the roadway, up to the area adjacent to the gas pumps. Thus, the inclusion of a more specific reference to "service station" in the definition in addition to "stores" and other business or retail establishments with parking areas indicates that the only remaining unique aspect of a service station, the driving/parking area near gas pumps, is also included. *See State v. Ramos*, 193 N.C. App. 629, 637, 668 S.E.2d 357, 363 (2008) ("We are guided by the principle of statutory construction that a statute should not be interpreted in a manner which would render any of its words superfluous. We construe each word of a statute to have meaning, where reasonable and consistent with the entire statute, because it is always presumed that the legislature acted with care and deliberation." (quotations, citation, and alterations omitted)); *see also State v. Conley*, 374 N.C. 209, 215, 839 S.E.2d 805, 809 (2020) ("It is presumed that the legislature did not intend any provision to be mere surplusage." (quotations, citation, and alterations omitted)); *State v. Ricks*, 237 N.C. App. 359, 366, 764 S.E.2d 692, 696 (rejecting State's argument on the grounds it would make part of § 20-4.01(32) "superfluous").

¶ 40     Here, according to unchallenged Findings of Fact, police searched Defendant's car when it was stopped by a gas pump at a gas station, where Defendant was pumping gas into the car. As we have explained, the area used for public vehicular

traffic adjacent to the gas pumps on the premises of the service station is included in the definition of public vehicular area. N.C. Gen. Stat. § 20-4.01(32)(a). Because Defendant's car was in a public vehicular area, the automobile exception can apply. *See Isleib*, 319 N.C. at 638, 356 S.E.2d at 576 (explaining one of the requirements for the automobile exception to apply is that the vehicle is "in a public vehicular area").

¶ 41        After acknowledging § 20-4.01(32)(a) includes "service stations," Defendant argues the statute only covers "driveways, roads, alleys, and parking lots at a service station" and therefore "read[ing] the statute to include a fuel pump area" would be an impermissible expansion of the statute in violation of *Ricks*. But our interpretation does not expand *Ricks* at all; it is entirely consistent with *Ricks*. *Ricks* was decided upon the lack of evidence that a vacant lot was open for public vehicular traffic at all. 237 N.C. App. at 366, 764 S.E.2d at 696. In *Ricks*, the defendant was stopped for driving while impaired on his moped while crossing a vacant lot on a dirt path. 237 N.C. App. at 360, 764 S.E.2d at 693. The State's evidence showed the "cut through on the vacant lot" had been used by pedestrians and bicyclists, it was wide enough for the police cruiser to enter, and there were "no signs, fences, or shrubs" to keep the public out. *Id.*, 237 N.C. App. at 361, 764 S.E.2d at 694. This Court held the State failed to present evidence the vacant lot was a public vehicular area because there was no evidence of ownership of the lot or that it was generally open to the public for vehicular traffic:

> In the present case, there is no evidence concerning the ownership of the vacant lot; nor is there evidence that the vacant lot had been designated as a public vehicular area by the owner. Moreover, a vacant lot is dissimilar to any of the examples provided in N.C. Gen. Stat. § 20–4.01(32)(a) that are generally open to the public. The fact that people walk and bicycle across the vacant lot as a shortcut does not turn the lot into a public vehicular area. In order to show an area meets the definition of public vehicular area in N.C. Gen. Stat. § 20–4.01(32)(a), we hold there must be some evidence demonstrating the property is similar in nature to those examples provided by the General Assembly in the statute. There was no such evidence in this case.

*Id.*, 237 N.C. App. at 366, 764 S.E.2d at 696.

¶ 42    The area adjacent to the gas pumps here is "similar in nature to those examples provided by the General Assembly in the statute," *id.*, specifically driveways and parking areas.  N.C. Gen. Stat. § 20-4.01(32)(a).  The area adjacent to a gas pump at a service station is entirely different from a dirt path used by bicycles and pedestrians on a vacant lot.  A service station's raison d'être is to be open to the public for vehicular traffic to and from the gas pumps; its primary purpose is to invite drivers of vehicles onto the property to drive in and park their vehicles next to the gas pumps to buy gas.

¶ 43    Defendant also argues a fuel pump is an area "where toxic flammable liquids are stored and dispensed" and one where "currency and private credit card information is exchanged, and goods are sold."  Defendant appears to be arguing this

makes a fuel pump private, but that argument cannot stand against the statutory definition of public vehicular area including service stations, N.C. Gen. Stat. § 20-4.01(32)(a)(2), which we have already concluded includes the area adjacent to fuel pumps.

¶ 44      We hold the driving or parking area adjacent to a fuel pump at a service station is a "public vehicular area" as defined by North Carolina General Statute § 20-4.01(32)(a).

## 2. *Plain View and Plain Smell Doctrines*

¶ 45      Beyond our conclusion Defendant's truck was in a public vehicular area, the automobile exception also requires the officers to have had probable cause for their search. *Isleib*, 319 N.C. at 638, 356 S.E.2d at 576. Defendant challenges the trial court's conclusion the officers had probable cause. As part of his challenge to the trial court's probable cause determination, Defendant argues the trial court improperly relied on the plain view and plain smell doctrines. We review the trial court's Conclusions of Law *de novo* and ask whether the Findings of Fact support the Conclusions of Law. *Reed*, 373 N.C. at 507, 838 S.E.2d at 421.

¶ 46      As we explained above, "[p]robable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Downing,* 169

N.C. App. at 795, 613 S.E.2d at 39; *see also Gates*, 462 U.S. at 230, 76 L. Ed. 2d at 543 (stating probable cause can also relate to a belief "that contraband or evidence is located in a particular place"). "In the context of the motor vehicle exception, 'a police officer in the exercise of his duties may search an automobile without a search warrant when the existing facts and circumstances are sufficient to support a reasonable belief that the automobile carries contraband materials.'" *State v. Parker*, 277 N.C. App. 531, 2021-NCCOA-217, ¶ 25 (alteration omitted) (quoting *State v. Degraphenreed*, 261 N.C. App. 235, 241, 820 S.E.2d 331, 336 (2018)), *disc. rev. denied* 860 S.E.2d 917 (2021). "The existence of probable cause is a commonsense, practical question that should be answered using a totality-of-the-circumstances approach." *Degraphenreed*, 261 N.C. App. at 241, 820 S.E.2d at 335 (quoting *State v. McKinney*, 361 N.C. 53, 62, 637 S.E.2d 868, 874 (2006)).

¶ 47        Here, the trial court properly considered the totality of the circumstances, determining police had probable cause "to conduct a search of the vehicle being driven by the Defendant, including the passenger seat area of the vehicle, the console and other areas where the contraband including the heroin and firearm were found" because of:

> the time and location of the encounter with the Defendant;
> the Defendant's connection with the Tahoe; the officers'
> observation of the Tahoe being involved in a heroin
> transaction earlier in the day; observation of the Defendant
> driving the Tahoe alone; an odor consistent with heroin

emanating from the vehicle; and a substance consistent
with heroin observed by the officers in plain view inside the
vehicle . . . .

The trial court had Findings of Fact to support each factor within its
Conclusion of Law on probable cause. As to the time and location of the encounter
with Defendant, the Findings establish the drug deal was supposed to happen at a
"Howard Johnson hotel" and Detective King saw Defendant at the gas station
"directly across from the Howard Johnson hotel" and "at approximately the time the
suspected drug transaction was to take place between Van and her source." The trial
court also found, "Based on the time, location and the other information gathered
during the course of the day throughout the investigation, King, Cole and other
officers reasonably believed Defendant was in that general location to deliver two
kilograms of heroin to Van and the informant."

As to the "the officers' observation of the [black SUV] being involved in a heroin
transaction earlier in the day" and "Defendant's connection to the" black SUV, the
Findings recounted how Ms. Van got into a black SUV to get the heroin sample and
how police searched the license plate of the black SUV that returned "an alert"
indicating "Defendant was driving" the SUV when a "domestic incident . . . occurred
five days prior" to the date of the events in this case. Further, as to the officers'
"observation of the Defendant driving the Tahoe alone," the trial court found when
Defendant pulled into the gas station by Detective King, "Defendant was the driver

of the vehicle, and was alone."

¶ 50 Finally, as to the factors about "an odor consistent with heroin emanating from the vehicle" and "a substance consistent with heroin observed by the officers in plain view inside the vehicle," the Findings recount:

> 21. After Defendant was detained, King exited his vehicle and walked around the outside of the Tahoe, which Defendant left with the windows down. As King walked around the Tahoe, he noticed the vehicle was emanating an odor of vinegar. Based on King's training and experience, such an odor is associated with heroin.
>
> 22. Upon walking around the Tahoe driven by Defendant, King observed in plain sight what he believed, based on his training and experience, to be two kilograms of heroin sticking out of the top of an open cereal box located on the front passenger seat. King reported this to Cole, who likewise smelled and saw what he believed to be heroin in plain view in the Tahoe recently driven by Defendant.

Thus, the trial court's Findings of Fact support its Conclusions of Law on probable cause.

¶ 51 Defendant first contests the Conclusions on probable cause by arguing about the strength (or lack thereof) of the evidence supporting the trial court's determination. First, as we have discussed, the trial court correctly followed the totality of the circumstances test in making its probable cause determination. Second, the trial court's Findings of Fact support its Conclusions of Law on probable cause. We only review those two components on appeal. *See Reed*, 373 N.C. at 507,

838 S.E.2d at 421 (explaining we review conclusions of law *de novo*, which "requires us to examine . . . whether the findings of fact support the conclusions of law." (quotations and citation omitted)). We do not reweigh the evidence as Defendant now asks us to do. *See Derbyshire*, 228 N.C. App. at 673, 745 S.E.2d at 889 (explaining how an appellate court gives "great deference to the trial court . . . because it is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision.").

¶ 52        Defendant also argues the trial court improperly relied upon the heroin being in plain view in the vehicle and the odor consistent with heroin coming from the vehicle. As to plain view, Defendant first argues for plain view to apply "the initial intrusion must also be valid," and he contends that was not the case here because he was not parked in a public vehicular area. While Defendant is correct that a police officer must have been "in a place where he had a right to be when the evidence was discovered" for plain view to apply, *Carter*, 200 N.C. App. at 54, 682 S.E.2d at 421 (quoting *State v. Graves*, 135 N.C. App. 216, 219, 519 S.E.2d 770, 772 (1999)), we have already concluded Defendant's black SUV was in a public vehicular area. Defendant also argues "[t]he location and packaging of the material that law enforcement suspected to be heroin . . . is also problematic" as to the plain view doctrine. But we do not reweigh the evidence, and an unchallenged Finding of Fact explains both

officers saw what they believed, based upon their training and experience, to be heroin in the SUV.

¶ 53    Finally, Defendant argues the plain smell doctrine cannot apply as "[t]here is no appellate authority in North Carolina specifically authorizing the search of a vehicle based on the odor of heroin." Defendant contends the plain smell doctrine has been used only for marijuana, not heroin. But this Court has previously explained "[p]lain smell of *drugs* by an officer is evidence to conclude there is probable cause for a search." *Downing*, 169 N.C. App. at 796, 613 S.E.2d at 39 (emphasis added). In *Downing*, the drug the officers smelled was cocaine, not marijuana. *Id.* And as Defendant recognizes, we have caselaw holding the smell of marijuana alone provides probable cause. *E.g. State v. Greenwood*, 301 N.C. 705, 708, 273 S.E.2d 438, 441 (1981). We see no reason to treat the plain smell of heroin any differently than the plain smell of marijuana or cocaine based upon the unchallenged Findings of Fact. Detective King "noticed the vehicle was emanating an odor of vinegar" and in his "training and experience, such an odor is associated with heroin."

¶ 54    In *Downing*, this Court addressed a similar situation where law enforcement officers had stopped the defendant's van while conducting a narcotics investigation based upon information from a confidential informant regarding sales of marijuana and cocaine. 169 N.C. App. at 792, 613 S.E.2d at 37. Upon searching the defendant, they found only some marijuana and a pipe, but the officers then needed to move the

defendant's van out of the roadway where it was stopped. *Id.*, 169 N.C. App. at 793, 613 S.E.2d at 37. The defendant consented for one of the officers to move the van out of the roadway. *Id.*, 169 N.C. App. at 793, 613 S.E.2d at 37–38.

> While moving the van, Sergeant Johnson "smelled a strong odor of what smelled like cocaine." Officers then searched the vehicle, although Defendant did not consent, and located a Wendy's restaurant food bag between the driver's seat and front passenger seat. Inside the food bag was a plastic bag containing approximately six ounces of cocaine. The officers then placed Defendant under arrest.

*Id.*, 169 N.C. App. at 793, 613 S.E.2d at 38.

¶ 55 This court held the officers had probable cause for the search of a vehicle based upon plain smell of cocaine. *Id.*, 169 N.C. App. at 796, 613 S.E.2d at 39 ("Plain smell of drugs by an officer is evidence to conclude there is probable cause for a search.")

¶ 56 Because the Findings support the trial court's Conclusions of Law on probable cause, we hold the trial court did not err in its probable cause determination and therefore properly denied Defendant's Motion to Suppress.

### III. Conclusion

¶ 57 We affirm the trial judge's denial of Defendant's Motion to Suppress. The Findings of Fact are supported by competent evidence, so we reject Defendant's challenges to them. Further, those Findings support the trial court's Conclusions of Law police had probable cause to search Defendant's vehicle. Within those Conclusions, the trial court did not err in applying the plain view and plain smell

doctrines to heroin, based upon the evidence presented by the State. Finally, the driving and parking area adjacent to fuel pumps at a service station is a public vehicular area under the definition provided in North Carolina General Statute § 20-4.01(32)(a). Therefore, the automobile exception to the warrant requirement applied to the search of Defendant's SUV parked at the gas pumps and the officers only needed probable cause to search Defendant's vehicle.

AFFIRMED AND NO ERROR.

Judges COLLINS and CARPENTER concur.